# In the United States Court of Federal Claims

No. 12-440 C

(E-Filed:  May 30, 2013)

|  |  |  |
|---|---|---|
| | ) | |
| MICHAEL B. VOLK, | ) | |
| | ) | Former Navy SEAL Challenges |
| Plaintiff, | ) | Revocation of His SEAL Navy |
| | ) | Enlisted Classification (NEC) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Stephen H. Carpenter, Jr., Seattle, WA, for plaintiff.

Jeffrey A. Regner, Trial Attorney, with whom were Stuart F. Delery, Acting Assistant Attorney General, and Jeanne E. Davidson, Director, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for defendant.  Michael M. O'Regan, Lieutenant Commander, Office of the Judge Advocate General, General Litigation Division, Department of the Navy, of counsel.

## OPINION

HEWITT, Chief Judge

Mr. Michael B. Volk (plaintiff or Mr. Volk), enlisted in the United States Navy (defendant, the Navy or the government) in December 1990 and served as a Navy SEAL for seventeen years.[1]  Compl., Docket Number (Dkt. No.) 1, ¶ 6.  On September 13, 2007 Mr. Volk was informed that the Navy had revoked his SEAL Navy Enlisted Classification (NEC).  Id. ¶ 30; see also Administrative Record (AR), Dkt. Nos. 7-1 to 7-3, at 10 (Art. 138 investigation report) (stating that plaintiff's SEAL NEC was revoked

---

[1]During this time, Mr. Michael B. Volk (Mr. Volk or plaintiff) received several awards, including the Sailor of the Quarter Award and a Navy Commendation Award.  Compl., Docket Number (Dkt. No.) 1, ¶ 7; Administrative Record (AR), Dkt. Nos. 7 to 7-2, at 42 (Volk statement).  For three years during his service as a SEAL, Mr. Volk served as an instructor at the Naval Special Warfare Center.  Compl. ¶ 6.

on September 13, 2007).[2]  In this action, Mr. Volk challenges the Navy's decision to revoke his SEAL NEC (including his entitlement to wear the SEAL trident pin (trident)) and seeks review of the decision by the Board for Correction of Naval Records (BCNR or the board) to deny his application for reinstatement of his SEAL NEC, return of his trident and backpay.  See generally Compl.

Defendant filed a motion requesting that the court dismiss plaintiff's claims for lack of jurisdiction and failure to state a claim upon which relief can be granted or, in the alternative, enter judgment for defendant on the administrative record.  See Mot. to Dismiss, or, in the Alternative, Mot. for J. on the Admin. R. (defendant's Motion or Def.'s Mot.), Dkt. No. 8, at 1.  With his response to defendant's Motion, plaintiff filed a cross-motion for judgment on the administrative record.  See Resp. to Def.'s Mot. to Dismiss & Pl.'s Cross Mot. for J. on the Admin. R. (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 11, at 1.  Now before the court are:  defendant's Motion, filed October 1, 2012; plaintiff's Motion, filed December 31, 2012; Defendant's Response to Plaintiff's Cross-Motion for Judgment on the Administrative Record and Reply in Support of Defendant's Motion to Dismiss, or, in the Alternative, Motion for Judgment on the Administrative Record (defendant's Reply or Def.'s Reply), Dkt. No. 13, filed January 23, 2013; and Plaintiff's Reply to Defendant's Response to Motion to Dismiss and Cross-Motions for

---

[2]This case follows administrative proceedings conducted by the United States Navy (defendant, the Navy or the government) and the Board for Correction of Naval Records (BCNR or the board).  See Compl. ¶¶ 32, 44 (describing Mr. Volk's initiation of the proceedings). Accordingly, much of the factual background in this Opinion is drawn from documents associated with those proceedings.  For convenient reference, the court provides a partial list of these documents and the names by which the court refers to them.

The documents related to Mr. Volk's complaint under Article 138 of the Uniform Code of Military Justice are:  the report in which Commander John H. Tate (Cdr. Tate) investigated the circumstances of Mr. Volk's Article 138 complaint and provided recommendations (Art. 138 investigation report), AR 10-17; three documents submitted as attachments to that report:  (1) Cdr. Tate's statement of his interview of Mr. Volk (Volk statement), AR 42-46, (2) Cdr. Tate's statement of his interview of Commander J.D. Thorleifson (Cdr. Thorleifson) (Thorleifson statement), AR 18-20, and (3) a legal advisory opinion in which Lieutenant Commander Angela Rongotes answered questions posed by Cdr. Tate about Mr. Volk's Article 138 complaint (Art. 138 advisory op.), AR 51-54; and a letter dated July 15, 2008, in which the commander of the Naval Special Warfare Command, G.J. Bonelli (Cdr. Bonelli), assessed Mr. Volk's Article 138 complaint based on the Article 138 investigation report and provided recommendations to the Secretary of the Navy as to the disposition of the Article 138 complaint (Bonelli letter), AR 6-9.

The documents related to proceedings before the BCNR are:  the advisory opinion in which J.L. Schultz, the Director of Military Community Management, provided recommendations to the BCNR with respect to Mr. Volk's request for correction of his military records, AR 28-31 (BCNR advisory op.), and the BCNR's decision denying Mr. Volk's request, AR 1-2 (BCNR decision).

Judgment on the Administrative Record (Pl.'s Reply), Dkt. No. 16, filed February 11, 2013.  For the reasons stated below, defendant's Motion is GRANTED-IN-PART and DENIED-IN-PART; plaintiff's Motion is DENIED.

I.      Background

        A.      Events Leading to Revocation of Mr. Volk's SEAL NEC

        The events leading up to the revocation of plaintiff's SEAL NEC took place during a training period before Mr. Volk's unit was deployed to Iraq.  See AR 6 (Bonelli letter) (stating that the training period ran from May 2006 to October 2007).  Plaintiff's description of these events portrays plaintiff as a whistleblower against whom the Navy retaliated because he revealed the reckless behavior of two superior officers.  See Compl. ¶ 52; Pl.'s Mot. 2-5.  Defendant's description stresses Mr. Volk's disciplinary problems, his poor performance as a Navy SEAL and his refusal to deploy with his unit.  See Def.'s Mot. 2-4.

        During the training period, Mr. Volk became concerned with the behavior of two of his superiors, Leading Chief Petty Officer John Previtera (LCPO Previtera), see Compl. ¶¶ 8-12, 15-18 (describing LCPO Previtera's actions) and Lieutenant Commander Ledford (Lt. Cdr. Ledford), see AR 44-45 (Volk statement) (describing Lt. Cdr. Ledford's actions).  On May 8, 2006 plaintiff was promoted to leading petty officer, a position in which he reported directly to LCPO Previtera.  Compl. ¶ 8.  Plaintiff alleges that, between September 2006 and November 2006, "Plaintiff became concerned with LCPO Previtera's reckless and unsafe behavior during military training events."[3]  Id. ¶ 9. For example, in one training exercise, plaintiff alleges that LCPO Previtera had agreed to provide simulated cover fire to allow retrieval of a SEAL injured in the exercise but, instead, "recklessly aimed his weapon and fired simulated ammunition rounds--an act that could have resulted in deaths had live ammunition been used."  Id. ¶¶ 10-12.

        Plaintiff also alleges that "[o]n January 07, 2007, while off[ ]duty, LCPO Previtera became intoxicated and assaulted a superior officer."[4]  Id. ¶ 15.  Plaintiff further alleges that during a training exercise held the following day, LCPO Previtera "displayed signs

_____

        [3]The "reckless and unsafe behavior" about which plaintiff complains, see Compl. ¶ 9, appears to refer to the "dangerous tactical decision making skills" displayed by Leading Chief Petty Officer John Previtera (LCPO Previtera), see AR 71 (witness statements).  The court understands the alleged danger to be that SEALs under LCPO Previtera's command could, as a result of his leadership, be placed in immediate physical danger in actual combat situations.  The court does not understand the alleged danger to encompass SEALS having been placed in immediate physical danger during the simulated exercises.

        [4]Plaintiff states that LCPO Previtera attacked the same superior officer again during the deployment and was arrested and relieved of his duties.  AR 40 (BCNR appl. statement).

of alcohol intoxication" and "fired a simulated ammunition round into the chest" of a member of his own team. Id. ¶ 16.  "Following this friendly fire incident[,] Plaintiff grew anxious of deploying to a war zone with LCPO Previtera." Id. ¶ 17.  In addition, according to plaintiff, "LCPO Previtera placed phone calls to Plaintiff threatening his life should he deploy with LCPO Previtera." Id.  Plaintiff's allegations regarding LCPO Previtera's actions during the training exercises are corroborated by the signed statements of three witnesses, two of whom witnessed each referenced training exercise. See AR 71 (witness statements).  The Administrative Record does not contain a statement by LCPO Previtera addressing Mr. Volk's account of his actions.

Mr. Volk's concerns about Lt. Cdr. Ledford resulted from Lt. Cdr. Ledford's "scrutinizing" and "'targeting' . . . everything [plaintiff] did," Lt. Cdr. Ledford's actions during training exercises, and Lt. Cdr. Ledford's attempts to cover for LCPO Previtera's misconduct.  See AR 44-45 (Volk statement).  For example, Mr. Volk states that, during a "live fire exercise," Lt. Cdr. Ledford "pointed a loaded weapon . . . at an instructor and said 'bang.'" Id. at 45.  Mr. Volk believes that if Mr. Volk had done this, his SEAL NEC would have been revoked. Id.  Mr. Volk further states that, during a training exercise--in which the court understands that live ammunition was not being used--Lt. Cdr. Ledford "shot an unarmed instructor and put a weapon on him to make it look like he was armed." Id.  Mr. Volk also states that Lt. Cdr. Ledford "blatantly lied to [plaintiff's] platoon and tried to cover for [LCPO] Previtera's drunken tardiness" and asserts that, along with LCPO Previtera, Lt. Cdr. Ledford "pushed for [plaintiff's] Captain's Mast" disciplinary proceeding, id. at 44, which the court discusses in more detail below.  The Administrative Record does not contain a statement by Lt. Cdr. Ledford addressing Mr. Volk's account of his actions.

During the training period, Mr. Volk suffered a series of disciplinary and other problems that led his commanding officer, Commander J.D. Thorleifson (Cdr. Thorleifson), "to completely lose all of his faith and confidence in [Mr.] Volk's ability to carry out his duties as a Navy SEAL." AR 18 (Thorleifson statement); see also AR 28-30 (BCNR advisory op.) (chronicling plaintiff's "noted deficiencies and incidents").  On October 13, 2006 Mr. Volk was counseled by LCPO Previtera "for failure to present a positive demeanor or establish any level of authority over his subordinates." AR 28 (BCNR advisory op.).  At 4:00 a.m. on January 20, 2007, before a freefall parachute training mission later on the same day, Mr. Volk was in a fight at a bar and was arrested.[5] Id.; see also AR 44 (Volk statement) (stating that Mr. Volk was arrested after a fight with the bar's bouncer).  Police officers attested that Mr. Volk "had to be forcibly removed

_____

[5]Mr. Volk states that there was no evidence that he provoked the fight, that the local police "dismissed all of the charges" and that the preliminary officer's investigation found him not to be at fault. AR 44 (Volk statement).  Mr. Volk further states that LCPO Previtera "plann[ed] to leave [him] behind while the platoon left on a plane" rather than attempting to secure his release from jail. Id.

from the establishment, smelled strongly of alcohol, and was unsteady on his feet." AR 28 (BCNR advisory op.). Mr. Volk's arrest delayed his team's plane, causing it to arrive late to the parachute training mission. AR 19 (Thorleifson statement). In February 2007, after Mr. Volk's arrest, a nonjudicial proceeding known as a captain's mast was conducted, and Mr. Volk was found guilty and punished with a conditionally suspended six-month reduction in pay grade. See AR 42 (Volk statement); see also AR 20 (Thorleifson statement) (describing Mr. Volk's punishment as "a suspended reduction in rate"); AR 29 (BCNR advisory op.) (stating that Mr. Volk received a reduction in pay grade, "suspended for six months").

In addition, on April 17, 2007 Mr. Volk was "counseled for knowing[ly] lying to his task unit commander . . . when questioned about who he had informed of his whereabouts." AR 29 (BCNR advisory op.). On May 9, 2007 Mr. Volk was issued a letter of instruction by Cdr. Thorleifson, which directed him to improve his poor performance and warned him that a failure to do so could result in the revocation of his SEAL NEC. Id. Mr. Volk was directed to "routinely check in with one of his Master Chiefs, so they could keep an eye on him." AR 19 (Thorleifson statement).

Plaintiff's commanding officer, Cdr. Thorleifson, also cited Mr. Volk's "extensive leave periods during critical pre-deployment training detachments" as a "difficult[y]." Id. During the spring of 2007, Cdr. Thorleifson granted Mr. Volk more than six weeks of leave to deal with certain family issues and to move his family to his permanent duty station. See AR 29 (BCNR advisory op.); AR 20 (Thorleifson statement) (discussing Mr. Volk's use of the leave granted). Despite the significant amount of leave he was granted, Mr. Volk did not move his family to his permanent duty station, and even requested leave to attend a voluntary sniper training program when he "could have asked to use the time to move his family"--a decision that "puzzled" Cdr. Thorleifson. AR 20 (Thorleifson statement).

On September 4, 2007 Mr. Volk met with Cdr. Thorleifson and requested to transfer to a different unit, Compl. ¶ 18, stating that "he was concerned for his personal safety should he deploy with [LCPO Previtera]," id. ¶ 19; see also AR 18 (Thorleifson statement) (stating that plaintiff told Cdr. Thorleifson that he "did not want to deploy with [his unit]" because "he wasn't getting along with the leadership"). At the time, Mr. Volk was at the end of "an 18-month training cycle . . . and was less than one month away from deployment." AR 28 (BCNR advisory op.). Cdr. Thorleifson denied Mr. Volk's request, Compl. ¶ 20, on the ground that replacing Mr. Volk with another SEAL "was not only unfair but unsafe, since all of the pre-deployment training was completed," AR 18 (Thorleifson statement). Cdr. Thorleifson noted in support of this decision that Mr. Volk's team was expected "to face intense combat action." Id. Mr. Volk thereafter presented Cdr. Thorleifson with a letter relinquishing his SEAL NEC, but Cdr. Thorleifson refused to accept it. Id. On September 5, 2007 Mr. Volk repeated his request to Cdr. Thorleifson to relinquish his SEAL NEC. Compl. ¶ 23; AR 18 (Thorleifson

statement).  This time, Cdr. Thorleifson accepted the request, and Mr. Volk submitted the paperwork necessary to effect a voluntary relinquishment.  See Compl. ¶¶ 23-24; AR 18 (Thorleifson statement); AR 45 (Volk statement); see also AR 21 (enlisted personnel action request) (signed by Mr. Volk).

On September 11, 2007, after speaking with a lawyer, Mr. Volk reconsidered his decision and asked to rescind the request to relinquish his SEAL NEC.  Compl. ¶¶ 25-26; see also AR 45 (Volk statement).  The same day, Mr. Volk learned that his paperwork had not yet been processed and informed Cdr. Thorleifson that he had changed his mind. Compl. ¶ 27; AR 45-46 (Volk statement).  Cdr. Thorleifson advised Mr. Volk that he could either deploy with his unit or continue with the voluntary relinquishment.  AR 46 (Volk statement).  When plaintiff responded that "he would deploy anywhere but not with [his unit]," id., Cdr. Thorleifson informed Mr. Volk that he intended to submit a request for the involuntary revocation of Mr. Volk's SEAL NEC,[6] see Compl. ¶ 29; AR 46 (Volk statement).

Cdr. Thorleifson filled out an NEC change request form, stating as follows: "Recommend revocation of [SEAL NEC] due to sustaining low professional performance in NEC[-]related skills and a major lack of confidence in his capability to operate as [a] Navy SEAL."  AR 26 (NEC change request form).  The relevant Navy rules require that revocation of a SEAL NEC "shall not be used as a punitive measure" and must be "based on [the] [commanding officer's] determination [the] member is no longer suitable for assignment[s] . . . requiring the NEC."  Naval Military Personnel Manual[7] (MILPERSMAN) 1220-300 ¶ 3(a) (2004).  The commanding officer "must substantiate

---

[6]The precise sequence of Mr. Volk's interactions with Cdr. Thorleifson and the timing of the paperwork filed by Mr. Volk and Cdr. Thorleifson are not clear from the record.  See, e.g., AR 19 (Thorleifson statement) (stating that Cdr. Thorleifson "wasn't exactly sure of the sequence of events"); Resp. to Def.'s Mot. to Dismiss and Pl.'s Cross Mot. for J. on the A.R. (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 11, at 5 (asserting that Cdr. Thorleifson submitted the request for an involuntary NEC change on September 12, 2007 but that the request was "back-dated to September 5, 2007"); cf. AR 13-14 (Art. 138 investigation report) (stating that Cdr. Thorleifson "filled out and signed" the paperwork for the involuntary NEC rescission on September 5, 2007 but did not submit it or the paperwork for the voluntary relinquishment "until 5 to 6 days later").

[7]A copy of the relevant provisions of the Naval Military Personnel Manual (MILPERSMAN) was submitted as an attachment to defendant's Motion to Dismiss, or, in the Alternative, Motion for Judgment on the Administrative Record (defendant's Motion or Def.'s Mot.), Dkt. No. 8.  See Dkt. No. 8-1 (relevant provisions of MILPERSMAN).  The parties appear to agree that the 2004 edition is the relevant edition of MILPERSMAN.  See id. (attaching portions of the 2004 edition of MILPERSMAN to defendant's Motion); Pl.'s Reply to Def.'s Resp. to Mot. to Dismiss & Cross-Mot. for J. on the Admin. R. (Pl.'s Reply), Dkt. No. 16, at 5 (citing the 2004 edition of MILPERSMAN).

that determination by providing sufficient background and reasonable justification for removal of [the] member's NEC[]." Id.; see also MILPERSMAN 1440-010 ¶ 8(a)(10) (stating that "[w]ritten documentation . . . is mandatory . . . , and must be included in a forced conversion package for loss of confidence"). Despite this requirement, Cdr. Thorleifson provided no background and no additional justification of the request. See AR 7 (Bonelli letter). On September 13, 2007 plaintiff was informed that his SEAL NEC had been revoked. Compl. ¶ 30; see also AR 10 (Art. 138 investigation report) (stating that plaintiff's SEAL NEC was revoked on September 13, 2007).

Mr. Volk's disciplinary problems continued after the revocation of his SEAL NEC. On October 17 and 22, 2007 Mr. Volk was "[c]ounseled for disobeying a direct order from the Executive Officer to not roam the command unescorted." AR 30 (BCNR advisory op.).

B.      Plaintiff's Pursuit of Administrative Remedies

1.      Article 138 Complaint

On November 30, 2007 Mr. Volk filed a complaint of wrong against Cdr. Thorleifson pursuant to Article 138 of the Uniform Code of Military Justice.[8] Compl. ¶ 32; see also AR 10 (Art. 138 investigation report) (discussing Mr. Volk's Article 138 complaint). Commander John H. Tate (Cdr. Tate) was appointed to investigate the circumstances of Mr. Volk's complaint on behalf of the Naval Special Warfare Command. AR 10 (Art. 138 investigation report); see Compl. ¶ 38.

Cdr. Tate found, as a result of his investigation, that Cdr. Thorleifson had not provided the required "sufficient background and reasonable justification" to involuntarily revoke Mr. Volk's SEAL NEC. AR 15 (Art. 138 investigation report) (internal quotation marks omitted). Nevertheless, Cdr. Thorleifson explained "[a]ll of his reasons to involuntarily remove [Mr.] Volk's trident" in a written response to Mr. Volk's Article 138 complaint. AR 19 (Thorleifson statement). Further, in an interview with

---

[8]Article 138 of the Uniform Code of Military Justice provides:

Any member of the armed forces who believes himself wronged by his commanding officer . . . may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.

10 U.S.C. § 938 (2006).

Cdr. Tate conducted as part of the Article 138 investigation, Cdr. Thorleifson explained that Mr. Volk had "put him in a bad situation" by "trying to use his Trident as a bargaining device to get out of deploying" less than a month before the deployment was to begin.  Id. at 18.  According to Cdr. Thorleifson, if he had agreed to Mr. Volk's ultimatum, he would have "lost the respect [of] his command" and encouraged other SEALs to "view [threats of relinquishment] as a method to make further demands upon him."  Id.  Cdr. Thorleifson expressed that Mr. Volk "did not live up to the ethos and spirit of the SEAL Creed or SEAL community" because "[a] true SEAL would never even think of using his Trident as a bargaining device or relinquish it to avoid his responsibility to deploy into combat."  Id. at 20.

In his interview with Cdr. Tate, Cdr. Thorleifson also explained that Mr. Volk "was a problem in his command" and described Mr. Volk's disciplinary problems.  Id. at 19.  Cdr. Thorleifson stated that, on one occasion, he had "reached out to support and assist [Mr.] Volk's wife, only to have [Mr.] Volk[] greatly distort the accounts of the event[] and wrongfully discredit him."  Id. at 20.  Cdr. Thorleifson stated that Mr. Volk had failed to advance through the ranks as was typical although "[e]veryone in CDR Thorleifson's command wanted [Mr.] Volk to succeed" and "gave [Mr.] Volk every opportunity to overcome his problems and get back on pace."  Id.  Cdr. Thorleifson further stated that he had given Mr. Volk an "opportunity to advance" by promoting him to leading petty officer, had ensured that the punishment issued in Mr. Volk's captain's mast proceeding was conditionally suspended and had given Mr. Volk a year to comply with the terms of the letter of instruction.  Id.  Cdr. Thorleifson expressed that he had given Mr. Volk "every opportunity to recover from his mistakes," but that "it became apparent" that Mr. Volk "wasn't going to take advantage of the command's assistance." Id.

During the interview, Cdr. Tate referenced paragraph four of MILPERSMAN 1220-300, see AR 19 (Thorleifson statement), which contains an illustrative list of "general circumstances" that "warrant revocation" of the SEAL NEC, see MILPERSMAN 1220-300 ¶ 4; see also infra Part III.C (discussing the list).  Cdr. Tate asked Cdr. Thorleifson whether each of the circumstances listed in MILPERSMAN 1220-300 as warranting revocation applied to Mr. Volk.  See AR 19 (Thorleifson statement).  Notwithstanding his description of Mr. Volk's behavior, which suggested otherwise, see infra note 18 (discussing this inconsistency), Cdr. Thorleifson answered that none of the circumstances applied to Mr. Volk, AR 19 (Thorleifson statement).

In furtherance of Cdr. Tate's Article 138 investigation, Lieutenant Commander Angela Rongotes (Lt. Cdr. Rongotes), on behalf of Captain Ben Clancy, provided a legal advisory opinion in which she determined that Cdr. Thorleifson had not complied with the substantiation requirement in MILPERSMAN 1220-300 and recommended that Cdr. Thorleifson resubmit the request to revoke Mr. Volk's SEAL NEC.  AR 51, 53 (Art. 138 advisory op.).  Lt. Cdr. Rongotes stated that, under MILPERSMAN 1220-300, the

commanding officer is required to provide documentation or "articulate specific instances" supporting the request and that "[a] couple of sentences from the [commanding officer] that say[] he lacks confidence in the sailor's abilities ought not fly." Id. at 53.

Accordingly, in his report assessing Mr. Volk's Article 138 complaint, Cdr. Tate recommended that Mr. Volk's SEAL NEC and trident "be restored with all back pay." AR 16 (Art. 138 investigation report). Cdr. Tate found that, "[a]lthough CDR Thorleifson's reasons were not vindictive," the revocation should be construed as a punitive measure as a result of its timing. Id. He further recommended that Cdr. Thorleifson resubmit the paperwork to request the involuntary revocation of Mr. Volk's SEAL NEC, attaching "sufficient background and reasonable justification." Id. at 17.

The commander of the Naval Special Warfare Command, G.J. Bonelli (Cdr. Bonelli), rejected Cdr. Tate's recommendation. See AR 6-9 (Bonelli letter). In a July 15, 2008 letter to the Secretary of the Navy assessing the merits of Mr. Volk's Article 138 complaint and providing recommendations, Cdr. Bonelli found that Cdr. Thorleifson was not wrong to deny Mr. Volk's request for a transfer less than a month before deployment in light of the "very extensive training and team[-]building exercises" Mr. Volk's task unit had completed. Id. at 6-7. Summarizing Mr. Volk's disciplinary history, unsatisfactory performance and ultimatum that he would resign his trident to avoid deployment if not granted a transfer, Cdr. Bonelli found that Cdr. Thorleifson was not wrong to recommend the removal of Mr. Volk's SEAL NEC on the grounds stated in the NEC change request form. Id. at 7. Cdr. Bonelli noted that "[i]t is clear . . . that the command leadership went to substantial measures to try to help [Mr.] Volk to continue to live up to the SEAL Ethos as well as assist him with his family matters." Id. at 8. Cdr. Bonelli "specifically note[d]" "the failure of [Cdr. Thorleifson] to articulate in the [NEC change request] form his justification for the NEC removal," but found that "the justification is amply laid out in the administrative record." Id. at 8; see also id. at 7 (stating same). The acting assistant secretary of the Navy for Manpower and Reserve Affairs, agreeing with the conclusions reached by Cdr. Bonelli, informed Mr. Volk by a letter dated October 24, 2008 that no additional action would be taken on his Article 138 complaint. AR 27 (Article 138 decision).

2.     BCNR Proceedings

By an application dated June 16, 2009 Mr. Volk petitioned the BCNR for correction of his military records and backpay. AR 4 (BCNR appl.). On October 6, 2009, J.L. Schultz, the Director of Military Community Management, issued an advisory opinion to the BCNR, concluding that "the involuntary removal of [Mr.] Volk's NEC was justified with proper cause and procedure," AR 30 (BCNR advisory op.), and recommending that Mr. Volk's application be denied, id. at 31. The BCNR advisory opinion discussed the circumstances surrounding the removal of Mr. Volk's SEAL NEC in detail and applied the provisions of MILPERSMAN 1220-300 to them. Id. at 28-30.

On January 28, 2010 the BCNR, sitting in executive session,[9] denied Mr. Volk's application, finding "that the evidence submitted was insufficient to establish the existence of probable material error or injustice." AR 1-2 (BCNR decision).  In its succinct, two-page decision, the BCNR stated that it had considered the allegations and evidence submitted by Mr. Volk, the BCNR advisory opinion and the applicable statutes and regulations. Id. at 1.  The BCNR stated that it "substantially concurred" with the BCNR advisory opinion and the Bonelli letter that the removal of Mr. Volk's SEAL NEC "was adequately substantiated . . . [and] was not in reprisal for actions [Mr. Volk] had taken to resolve issues in [his] unit, and that the irregularities in administrative procedure were not material." Id. at 1-2.

Plaintiff filed this action in the United States Court of Federal Claims (Court of Federal Claims) on July 10, 2012.  See generally Compl.  In count one of the Complaint, plaintiff alleges that Cdr. Thorleifson violated the First Amendment to the United States Constitution and the Military Whistleblower Protection Act (Whistleblower Act), 10 U.S.C. § 1034 (2006), by revoking Mr. Volk's SEAL NEC in retaliation for Mr. Volk's "reporting his superiors' misconduct."  Compl. ¶¶ 49-52.  In count two of the Complaint, plaintiff alleges that his SEAL NEC was revoked without due process of law. Id. ¶¶ 53-56.  In addition, although plaintiff's Complaint does not specifically state a claim based upon the Military Pay Act, 37 U.S.C. § 204 (2006), as defendant acknowledges, "[l]iberally construed, . . . the complaint seeks review of the decision of the BCNR and back pay under the Military Pay Act."  Def.'s Mot. 5; cf. Compl. ¶ 2 (asserting that this court has jurisdiction pursuant to the Tucker Act and the Military Pay Act); id. ¶¶ 55-56 (alleging that the revocation of plaintiff's SEAL NEC and trident "resulted in the deprival of Plaintiff's monetary benefits, including all back pay, allowances, retirement, and other warranted remuneration").  The court, therefore, also understands the Complaint to assert a claim for relief under the Military Pay Act.

Defendant filed a motion requesting that the court dismiss plaintiff's count one and count two for lack of jurisdiction and plaintiff's Military Pay Act claim for failure to state a claim or, in the alternative, enter judgment for defendant on the administrative record with respect to plaintiff's Military Pay Act claim.  See generally Def.'s Mot. Plaintiff filed a cross-motion for judgment on the administrative record. Pl.'s Mot. 1. For the reasons discussed below, defendant's Motion is GRANTED-IN-PART and DENIED-IN-PART.  Plaintiff's Motion is DENIED.

II.   Legal Standards

   A.   Motions to Dismiss Under RCFC 12(b)(1)

---

[9]After the BCNR accepts an application for consideration, a three-member panel of the BCNR, sitting in executive session, determines whether to deny the application, recommend that the applicable records be corrected or grant a hearing. 32 C.F.R. § 723.3(e)(1) (2012).

The Tucker Act establishes and limits the jurisdiction of the Court of Federal Claims.  See 28 U.S.C. § 1491 (2006).  The Tucker Act affords this court jurisdiction over claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  Id. § 1491(a)(1). Although the Tucker Act waives the sovereign immunity necessary for a plaintiff to sue the United States for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does not confer any substantive rights upon a plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976).  A plaintiff must establish an independent substantive right to money damages from the United States--that is, a money-mandating source within a contract, regulation, statute or constitutional provision--in order for the case to proceed.  See Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1306 (Fed. Cir. 2008).

In considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), the court must accept as true all undisputed allegations of fact made by the non-moving party and draw all reasonable inferences from those facts in the non-moving party's favor.  See Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995)).  The burden is on the plaintiff to show jurisdiction by a preponderance of the evidence.  Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002).  If the court determines that it does not have jurisdiction over a claim, it must dismiss the claim.  See RCFC 12(h)(3).

B.    Motions to Dismiss Under RCFC 12(b)(6)

A motion to dismiss pursuant to RCFC 12(b)(6)[10] asserts a "failure to state a claim upon which relief can be granted."  RCFC 12(b)(6).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  This means that the complaint must "raise a right of relief above the speculative level."  See Twombly, 550 U.S. at 555.

---

[10]The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP).  C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993); see RCFC 2002 rules committee note ("[I]nterpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure.").  Rule 12 of the RCFC is substantially identical to Rule 12 of the FRCP.  Compare RCFC 12 with FRCP 12.  Therefore, the court relies on cases interpreting FRCP 12 as well as those interpreting RCFC 12.

When ruling on a Rule 12(b)(6) motion to dismiss, the court "must accept as true all the factual allegations in the complaint." Sommers Oil Co. v. United States (Sommers Oil), 241 F.3d 1375, 1378 (Fed. Cir. 2001). Based on this information, the court must make "all reasonable inferences in favor of the non-movant." Id. Nonetheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Further, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); accord Twombly, 550 U.S. at 555.

C.      Motions for Judgment on the Administrative Record

Motions for judgment on the administrative record are governed by Rule 52.1(c) of the RCFC. See RCFC 52.1(c). "A motion for judgment upon the administrative record is distinguishable from a motion for summary judgment." Mission Critical Solutions v. United States, 91 Fed. Cl. 386, 394 (2010) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005), appeal dismissed per stipulation, 452 F. App'x 962 (Fed. Cir. 2010) (unpublished); RCFC 52.1 rules committee note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record.")). When evaluating cross-motions for judgment on the administrative record, the court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010) (citing Bannum, Inc., 404 F.3d at 1356-57). "The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding." CRAssocs., Inc. v. United States, 102 Fed. Cl. 698, 710 (2011) (citing, inter alia, Bannum, Inc., 404 F.3d at 1356), aff'd per curiam, 475 F. App'x 341 (Fed. Cir. 2012) (unpublished).

D.      Review of Military Personnel Decisions

1.      Justiciability

"Justiciability is a particularly apt inquiry when one seeks review of military activities," and the court may not address a claim that presents a nonjusticiable issue. See Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993). Whether an issue is justiciable depends on "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." Baker v. Carr, 369 U.S. 186, 198 (1962). Because "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," Gilligan v. Morgan, 413 U.S. 1, 10 (1973), such decisions are "frequently beyond the institutional competence of courts to review," Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002), and are justiciable only to the extent that the military's discretion is limited and Congress has

provided "tests and standards" for the court to apply, Murphy, 993 F.2d at 873 (internal quotation marks omitted).

When the merits of a military personnel decision are nonjusticiable, the process by which the decision was made nevertheless may be subject to judicial review.  Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995).  "[B]y their nature[,] [military] procedures limit the military's discretion" because the military "is bound to follow its own procedural regulations if it chooses to implement some."  Murphy, 993 F.2d at 873; see also Service v. Dulles, 354 U.S. 363, 388 (1957) (stating that the United States Department of State must follow its own procedural regulations).

2.      Review of the Decisions of Corrections Boards

To prevail in a challenge to a correction board decision, a service member "bears the burden of demonstrating by cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence."  Arens v. United States, 969 F.2d 1034, 1037 (Fed. Cir. 1992); Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed. Cir. 1986).  Thus, correction board decisions "may be reviewed for failure to correct plain legal error committed by the military," including "the military's violation of statute, or regulation, or published mandatory procedure, or unauthorized act."  Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (internal quotation marks omitted).

"The arbitrary and capricious standard . . . is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  "Substantial evidence requires 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  O'Brien v. Office of Pers. Mgmt., 144 F.3d 1458, 1461 (Fed. Cir. 1998) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)).  The service member "must overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith."  Sanders v. United States, 219 Ct. Cl. 285, 302, 594 F.2d 804, 813 (1979) (en banc), superseded by statute on other grounds, Defense Officer Personnel Management Act of 1980, Pub. L. No. 96-513, § 104, 94 Stat. 2835, 2859-60 (codified as amended at 10 U.S.C. § 628), as recognized in Richey v. United States, 322 F.3d 1317 (Fed. Cir. 2003).  Except in "extremely limited situations," the court must limit its review to the administrative record.  Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006).  In addition to establishing an error by cogent and clearly convincing evidence, the service member must "show[] a 'nexus' between the error or injustice and the subsequent" adverse military decision, meaning that the procedural error must have "substantially affected the decision in question."  Lindsay, 295 F.3d at 1259; see, e.g., Loeh v. United States, 57 Fed. Cl. 743, 750 (2003), aff'd per curiam, 99 F. App'x 902 (Fed. Cir. 2004) (unpublished).

III.    Discussion

    A.    The Court Has Jurisdiction over Plaintiff's Military Pay Act Claim Only

Counts one and two of the Complaint assert claims under the Whistleblower Act, the First Amendment and the Fifth Amendment Due Process Clause.  Compl. ¶¶ 49-56. Defendant contends that counts one and two of plaintiff's Complaint must be dismissed because the court lacks jurisdiction over claims under the Whistleblower Act, the First Amendment and the Due Process Clause.  Def.'s Mot. 4-7.  Defendant appears to concede that, to the extent that plaintiff also asserts a claim for relief under the Military Pay Act, the court's jurisdiction over plaintiff's Military Pay Act claim is proper.  See Def.'s Mot. 5-6 (discussing the court's jurisdiction over Military Pay Act claims and stating that the Complaint, "[l]iberally construed, . . . seeks review of the decision of the BCNR and back pay under the Military Pay Act").

Plaintiff responds that the court's jurisdiction over this case is properly based, in part, on the Military Pay Act, see Pl.'s Mot. 10-12, and--quoting selectively from the decision of the United States Court of Appeals for the Federal Circuit (Federal Circuit) in Holley v. United States, 124 F.3d 1462 (Fed. Cir. 1997)--argues that "'[t]he presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim,'" Pl.'s Mot. 14 (quoting Holley, 124 F.3d at 1466). Plaintiff's assertion is correct; however, plaintiff's conclusion that the court therefore has jurisdiction over his standalone constitutional claims is incorrect.  Further, it is well established that this court lacks jurisdiction over Whistleblower Act claims.  Chisolm v. United States, 82 Fed. Cl. 185, 199 (2008), aff'd per curiam, 298 F. App'x 957 (Fed. Cir. 2008) (unpublished).

Because the Tucker Act does not confer any substantive rights, Testan, 424 U.S. at 398, a plaintiff must establish an independent substantive right to money damages from the government, Jan's Helicopter Serv., Inc., 525 F.3d at 1306.  The Whistleblower Act is not money mandating.  Chisolm, 82 Fed. Cl. at 199.  Nor are the First Amendment, United States v. Connolly, 716 F.2d 882, 887 (Fed. Cir. 1983) (en banc), or the Due Process Clause,[11] id; James v. Caldera, 159 F.3d 573, 581 (Fed. Cir. 1998).  Accordingly, the court finds that it lacks jurisdiction over plaintiff's Whistleblower Act, First Amendment and Due Process claims.

The Military Pay Act, however, is money mandating, Metz, 466 F.3d at 998, and the court finds that plaintiff's Military Pay Act claim for back pay and reinstatement of his SEAL NEC and trident is within the court's jurisdiction.  Further, as the Federal

---

[11]Plaintiff appears to concede that claims based on the Due Process Clause are not within the jurisdiction of the court.  See Pl.'s Mot. 23 (stating that, "[w]hile the due process clause may not be jurisdictionally applicable, the precepts of 'fairness' certainly are").

Circuit explained Holley, a claim under the Military Pay Act may assert that a discharge was wrongful on statutory, regulatory or constitutional grounds. See Holley, 124 F.3d at 1465. If the service member claims that the discharge was wrongful on constitutional grounds, determination of the merits of the claim "may include consideration of whether his removal violated constitutional rights." Id. at 1466. The "constitutional issue does not stand alone, but is a factor in the claim for which Tucker Act jurisdiction is established." Id. Therefore, to the extent that potential violations of plaintiff's rights under the Whistleblower Act, the First Amendment or the Due Process Clause are a factor in plaintiff's Military Pay Act claim, the court may consider such violations in its determination of the merits of plaintiff's Military Pay Act claim. Cf. id. However, such alleged violations do not support standalone claims. Cf. id.

Accordingly, defendant's Motion is GRANTED with respect to plaintiff's claims based on the Whistleblower Act, the First Amendment and the Due Process Clause, and plaintiff's claims based on the Whistleblower Act, the First Amendment and the Due Process Clause are DISMISSED for lack of jurisdiction. Cf. RCFC 12(h).[12]

B.      Plaintiff's Military Pay Act Claim States a Claim Upon Which Relief Can Be Granted

Defendant contends that plaintiff's Military Pay Act claim must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted because plaintiff's "fundamental request is that this Court redo the Navy's fitness decision," an issue that is nonjusticiable. Def.'s Mot. 7, 9; see also Def.'s Reply 3. The court agrees that Mr. Volk's suitability for further service as a Navy SEAL is a professional military decision and therefore nonjusticiable. Cf. Gilligan, 413 U.S. at 10; Lindsay, 295 F.3d at 1257; Murphy, 993 F.2d at 872 (stating that a court may not address nonjusticiable professional military judgments). However, the court does not interpret plaintiff to be contending that the Navy's suitability determination was incorrect on its merits. See Pl.'s Mot. 16 (stating that plaintiff's claims are justiciable because they address the Navy's failure to afford Mr. Volk the protections required by MILPERSMAN 1220-300). Therefore, defendant's Motion to dismiss plaintiff's Military Pay Act claim pursuant to Rule 12(b)(6) is DENIED.

C.      Cross-Motions for Judgment on the Administrative Record

To prevail in a challenge to a correction board decision, a service member "bears the burden of demonstrating by cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination

---

[12]To the extent that plaintiff appears to suggest in briefing that the court has jurisdiction over its claims pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2006), see Pl.'s Mot. 15, plaintiff is incorrect, see Murphy v. United States, 993 F.2d 871, 874 (Fed. Cir. 1993) ("[T]he Claims Court has no authority to invoke the APA.").

was unsupported by substantial evidence." <u>Arens</u>, 969 F.2d at 1037. Accordingly, the service member may contend that the correction board "fail[ed] to correct plain legal error committed by the military," such as "the military's violation of statute, or regulation, or published mandatory procedure, or unauthorized act." <u>Dodson</u>, 988 F.2d at 1204 (internal quotation marks omitted). To demonstrate an entitlement to relief based on a procedural error, the service member must "show[] a 'nexus' between the error or injustice and the subsequent" adverse military decision, meaning that the procedural error must have "substantially affected the decision in question." <u>Lindsay</u>, 295 F.3d at 1259.

The revocation of a SEAL NEC is governed by MILPERSMAN 1220-300, which provides that involuntary "revocation shall not be used as a punitive measure" and must be "based on [the] [commanding officer's] determination [the] member is no longer suitable for assignment[s] . . . requiring the NEC." MILPERSMAN 1220-300 ¶ 3(a). The next paragraph of the regulation lists the following "[g]eneral circumstances" in which a commanding officer could determine that a service member "is no longer suitable" for the SEAL NEC:

> 4.   <u>Reasons for Revocation</u>. General circumstances which warrant revocation of an NEC include
>
> . . . .
>
> b.   sustained low or erratic professional performance in NEC-related skills such as
>   (1)   declining physical capability,
>   (2)   culpable negligence, or
>   (3)   bre[a]ches in diving, ordnance, or parachuting safety;
> c.   failure or unwillingness to perform duties required of NEC[.]

MILPERSMAN 1220-300 ¶ 4. On the form requesting revocation of Mr. Volk's SEAL NEC, Cdr. Thorleifson listed two justifications for his request: "sustain[ed] low professional performance in NEC[-]related skills" and "a major lack of confidence in [Mr. Volk's] capability to operate as a Navy SEAL." AR 26 (NEC change request form).

Plaintiff appears to make five arguments with respect to Cdr. Thorleifson's decision to revoke his SEAL NEC and the BCNR's subsequent decision upholding Cdr. Thorleifson's action.[13] The court understands plaintiff's first argument to be that, to the

---

[13]In addition, plaintiff contends that "the Government lost significant records" and appears to request that the court draw an adverse inference--which plaintiff does not describe-- against the government. <u>See</u> Pl.'s Mot. 23. Although, during the Article 138 investigation, the Navy was unable to locate the original NEC change request form submitted by Cdr. Thorleifson and the form submitted by Mr. Volk when he attempted to voluntarily resign his SEAL NEC, <u>see</u> AR 24 (Cdr. Tate's statement of his interview of SEAL enlisted community manager Jody McIntyre (McIntyre statement)); AR 8 (Bonelli letter), copies of both documents are in the Administrative Record, <u>see</u> AR 21 (enlisted personnel action request); AR 26 (NEC change request form), and the copy of the NEC change request form appears to have been found in time

extent that Cdr. Thorleifson revoked Mr. Volk's SEAL NEC on the basis of "a major lack of confidence in his capability to operate as a Navy SEAL," AR 26 (NEC change request form), Cdr. Thorleifson's action was contrary to law, see Pl.'s Reply 2 (discussing "Defendant's efforts to expand [the] narrowly tailored bases for revocation"); cf. Arens, 969 F.2d at 1037 (stating that a service member must demonstrate "that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence"), and therefore should have been reversed by the BCNR, cf. Dodson, 988 F.2d at 1204 (stating that a service member may contend that the correction board "fail[ed] to correct plain legal error committed by the military," such as "the military's violation of statute, or regulation, or published mandatory procedure, or unauthorized act" (internal quotation marks omitted)).  Specifically, it is plaintiff's view that MILPERSMAN 1220-300 provides an "exhaustive list" of circumstances warranting the removal of a SEAL NEC and that the list does not include "'major lack of confidence.'"  Pl.'s Mot. 5; see also Pl.'s Reply 2 (stating that the list is "intended to be all inclusive" (internal quotation marks omitted)).

However, the court is persuaded by Cdr. Bonelli's interpretation of Cdr. Thorleifson's statement on the NEC change request form.  In light of Mr. Volk's unsatisfactory performance, disciplinary problems and ultimatum that he would resign his SEAL NEC if not transferred to another unit, see supra Part I.A (describing the foregoing problems in detail), Cdr. Bonelli interpreted Cdr. Thorleifson's statement that he had "'a major lack of confidence in [Mr. Volk's] capability to operate as a Navy SEAL,'" AR 7 (Bonelli letter) (quoting AR 26 (NEC change request form)), to reflect one of the

---

to be discussed in Cdr. Bonelli's July 15, 2008 letter, see AR 7-8 (Bonelli letter) (quoting from the NEC change request form but appearing to state that the original was "nowhere to be found").  Plaintiff does not contend that the copies provided to the court are inaccurate, or that plaintiff was prejudiced by the loss of the original documents.

The official whose office handled both forms stated to Cdr. Tate that, although the absence of the forms "was extremely strange and unusual," "he did not believe there was any 'foul play.'"  AR 24 (McIntyre statement).  Because there is no evidence in the record that foul play caused the loss of Mr. Volk's original paperwork, because accurate copies of the documents appear to have been provided to the court and because of the "presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith," Sanders v. United States, 219 Ct. Cl. 285, 302, 594 F.2d 804, 813 (Fed. Cir. 1979) (en banc), superseded by statute on other grounds, Defense Officer Personnel Management Act of 1980, Pub. L. No. 96-513, § 104, 94 Stat. 2835, 2859-60 (codified as amended at 10 U.S.C. § 628), as recognized in Richey v. United States, 322 F.3d 1317 (Fed. Cir. 2003), the court declines to draw an adverse inference against the government, cf. Alexce v. Shinseki, 447 F. App'x 175, 178 (Fed. Cir. 2011) (per curiam) (unpublished) (noting that the plaintiff had not been deprived of evidence by the routine destruction of duplicate documents and concluding that "[t]here is no force to the argument that the destruction of duplicative materials constitutes spoliation of evidence").

17

"'[g]eneral circumstances'" listed in MILPERSMAN 1220-300 ¶ 4 as warranting removal of a SEAL NEC: "'failure or unwillingness to perform duties required of NEC,'" see id. (quoting MILPERSMAN 1220-300 ¶ 4(c)).  To the extent that Cdr. Thorleifson added the term "major lack of confidence" to his description of Mr. Volk's failure or unwillingness to perform his duties, see AR 26 (NEC change request form), the court agrees with Cdr. Bonelli that Cdr. Thorleifson's justification fits the general requirement that revocation of a service member's SEAL NEC must be based on the commanding officer's determination that the service member is "'no longer suitable'" for assignments requiring the SEAL NEC because it "convey[ed] his determination regarding [Mr. Volk's] suitability," see AR 8 (Bonelli letter) (quoting MILPERSMAN 1220-300 ¶ 3(a)).[14]  The court therefore concludes that, by revoking Mr. Volk's SEAL NEC in part on the basis of "a major lack of confidence in his capability to operate as a Navy SEAL," AR 26 (NEC change request form), Cdr. Thorleifson did not commit "plain legal error" by "violation of statute, or regulation, or published mandatory procedure," cf. Dodson, 988 F.2d at 1204 (internal quotation marks omitted).

The court understands plaintiff's second argument to be that, to the extent that the BCNR concluded that revocation of Mr. Volk's SEAL NEC was warranted on the basis of "sustained low professional performance in NEC[-]related skills," see Pl.'s Reply 3 (internal quotation marks omitted), this conclusion was "unsupported by substantial evidence,"[15] cf. Arens, 969 F.2d at 1037.  According to plaintiff, at the time that Mr.

---

[14]Additionally, by its terms, the regulation does not provide an exhaustive list of circumstances demonstrating that a SEAL is no longer suitable for assignments requiring the SEAL NEC.  Instead, it lists "[g]eneral circumstances," which "include" "sustained low or erratic professional performance in NEC-related skills" and "failure or unwillingness to perform duties required of NEC."  MILPERSMAN 1220-300 ¶ 4 (emphasis added).  The use of the term "[g]eneral circumstances" and the specification that circumstances warranting the involuntary removal of a SEAL NEC "include" the circumstances described (instead of being limited to the circumstances described) indicate that the list is not exhaustive.  See id.  Accordingly, Cdr. Thorleifson could have properly based his revocation of Mr. Volk's SEAL NEC on circumstances other than those listed in MILPERSMAN 1220-300 ¶ 4.

[15]Plaintiff phrases this argument in terms of Cdr. Thorleifson's decision to revoke Mr. Volk's SEAL NEC not being supported by substantial evidence.  See, e.g., Pl.'s Mot. 2 (referring to the evidence available to the Navy at the time that Mr. Volk's SEAL NEC was revoked).  However, the court's review is focused on the decision of the BCNR.  See Sanders, 219 Ct. Cl. at 298, 594 F.2d at 811 ("Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence . . . ."); see also Barnick v. United States, 80 Fed. Cl. 545, 556 (2008) (same), aff'd, 591 F.3d 1372 (Fed. Cir. 2010).  The court observes, however, that the evidence available to the BCNR and to Cdr. Thorleifson with respect to Mr. Volk's suitability for continued service as a Navy SEAL would have been substantially similar, if not identical.

Volk's SEAL NEC was revoked, "the Navy lacked any evidence of sustained low professional performance in NEC-related . . . skills," Pl.'s Mot. 2 (internal quotation marks omitted), a ground for revocation that, plaintiff contends, is limited by the text of the regulation to "'declining physical capability, culpable negligence, or bre[a]ches in diving, ordnance, or parachuting safety,'" id. at 5 (quoting MILPERSMAN 1220-300 ¶ 4(b)).  Plaintiff notes Cdr. Tate's statements that "'there is no history of sustained low professional performance in NEC[-]related skills in [Mr.] Volk's'" evaluation record, id. at 7 (quoting AR 15 (Art. 138 investigation report)); see also id. at 18 (same), and that the disciplinary issues addressed in Mr. Volk's letter of instruction "'were unrelated to his . . . NEC skills,'" Pl.'s Reply 4 (emphasis omitted) (quoting AR 16 (Art. 138 investigation report)).  Plaintiff asserts that "the revocation of [Mr. Volk's] SEAL status was so warrantless . . . that it was tantamount to [an] expressly forbidden 'punitive measure.'"  Pl.'s Mot. 2 (quoting MILPERSMAN 1220-300 ¶ 3(a)).

However, the Administrative Record contains substantial evidence of Mr. Volk's poor performance.  Cf. O'Brien, 144 F.3d at 1461 (stating that "[s]ubstantial evidence requires more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotation marks omitted)).  Although Cdr. Tate had concluded that "there is no history of sustained low professional performance in NEC[-]related skills in [Mr.] Volk's" evaluation record, AR 15 (Art. 138 investigation report), many of Mr. Volk's performance problems "appeared to manifest themselves after the closeout of the last[16] regular evaluation period,"[17] AR 8 (Bonelli letter).  Additionally, Mr. Volk had been arrested while intoxicated at 4:00 a.m. the day before a freefall parachute exercise, AR 28 (BCNR advisory op.), which could reasonably be interpreted as a breach of parachute safety or an instance of culpable negligence, two of the examples of "sustained low or erratic professional performance in NEC-related skills" provided in the regulation, cf. MILPERSMAN 1220-300 ¶ 4(b).

Furthermore, Mr. Volk had been counseled "for failure to present a positive demeanor or establish any level of authority over his subordinates," AR 28 (BCNR advisory op.), and had failed to advance through the ranks along with his peers although given "every opportunity to overcome his problems and get back on pace," AR 20 (Thorleifson statement), both of which could reasonably be interpreted as evidence of "sustained low or erratic professional performance in NEC-related skills," cf. MILPERSMAN 1220-300 ¶ 4(b).  Although plaintiff contends that this ground for revocation is limited to the examples provided in MILPERSMAN 1220-300 ¶ 4, Pl.'s

---

[16]Cdr. Tate believed that he had all of Mr. Volk's evaluations.  See AR 42 (Volk statement) (stating that Cdr. Tate had reviewed "[a]ll of [Mr. Volk's] evals").

[17]Plaintiff quotes from what it describes as Mr. Volk's "last performance evaluation" to support its view that Mr. Volk's NEC-related skills did not decline.  See Pl.'s Mot. 8.  This evaluation, however, is not part of the Administrative Record.

Mot. 5, plaintiff's interpretation of the regulation is too narrow.  MILPERSMAN 1220-300 ¶ 4 describes "sustained low or erratic professional performance in NEC-related skills <u>such as</u> . . . culpable negligence, or . . . bre[a]ches in . . . parachuting safety." MILPERSMAN 1220-300 ¶ 4(b) (emphasis added).  The use of the term "such as" indicates that the list of NEC-related skills listed is illustrative, not exhaustive.  <u>See supra</u> note 14 (discussing plaintiff's overly narrow reading of MILPERSMAN 1220-300 ¶ 4, in general).  Therefore, the consideration of these examples of Mr. Volk's poor performance is not contrary to the regulation.[18]  <u>Cf.</u> MILPERSMAN 1220-300 ¶ 4(b).

It is not the role of the court to reweigh this evidence to determine whether revocation of Mr. Volk's SEAL NEC was warranted.  <u>Cf. Heisig v. United States</u>, 719 F.2d 1153, 1157 (Fed. Cir. 1983) (stating that the substantial evidence standard "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence" (emphasis omitted)); <u>Adkins v. United States</u>, 228 Ct. Cl. 909, 913 (1981) (per curiam) ("Whether the court would reach the same result as the board is not for us to say.  We are not a super correction board . . . .").  Instead, the court must determine whether the BCNR's decision was supported by substantial evidence.  <u>Arens</u>, 969 F.2d at 1037; <u>Heisig</u>, 719 F.2d at 1157.  The court concludes that it was.

The court understands plaintiff's third argument to be that Cdr. Thorleifson's failure to submit "'sufficient background and reasonable justification'" with his request to revoke Mr. Volk's SEAL NEC was a violation of the Navy's rules and therefore should have been reversed by the BCNR.  Pl.'s Mot. 2 (quoting MILPERSMAN 1220-300 ¶ 3(a)); <u>see also id.</u> at 18 (same).  In support of this argument, plaintiff quotes the following passage of the legal advisory opinion submitted by Lt. Cdr. Rongotes regarding Mr. Volk's Article 138 complaint:  "If the Navy isn't going to follow their own rules in

---

[18]During his interview with Cdr. Thorleifson, Cdr. Tate asked whether "Mr. Volk had any documented history" with respect to each of the general circumstances listed in MILPERSMAN 1220-300 ¶ 4 as warranting involuntary removal of a SEAL NEC.  <u>See</u> AR 19 (Thorleifson statement).  Cdr. Thorleifson answered no to each factor.  <u>See id.</u>  Plaintiff interprets this statement to be a concession that Mr. Volk's history did not warrant involuntary revocation of his SEAL NEC pursuant to MILPERSMAN 1220-300.  Pl.'s Reply 2; <u>see also id.</u> at 4 (citing this statement for the proposition that Mr. Thorleifson did not believe that Mr. Volk's alcohol-related arrest before a parachute freefall exercise warranted revocation of Mr. Volk's SEAL NEC).

It is not clear from the Administrative Record why Cdr. Thorleifson answered Cdr. Tate the way he did.  However, in light of Cdr. Thorleifson's description of Mr. Volk's performance as a SEAL, <u>see supra</u> Part I.A, and his request that Mr. Volk's SEAL NEC be revoked "due to sustaining low professional performance in NEC[-]related skills and a major lack of confidence in his capability to operate as a Navy SEAL," AR 26 (NEC change request form), the court concludes that Cdr. Thorleifson did not intend to concede that Mr. Volk's actions did not warrant involuntary removal of his SEAL NEC pursuant to MILPERSMAN 1220-300.

how matters are adjudicated then, one, why have the rule, and two, how can we expect our service members to follow the rules[?]  What it comes down to is have the requirements outlined in the MILPERSMAN been met, answer:  NO."  AR 53 (Art. 138 advisory op.); see Pl.'s Mot. 6 (quoting same with minor alterations).

Plaintiff is correct that, under MILPERSMAN 1220-300 ¶ 3(a), the commanding officer "must substantiate" the determination that the service member is no longer suitable for assignments requiring the SEAL NEC "by providing sufficient background and reasonable justification for removal of the member's NEC."  MILPERSMAN 1220-300 ¶ 3(a); see also MILPERSMAN 1440-010 ¶ 8(a)(10) (stating that "[w]ritten documentation . . . is mandatory . . . , and must be included in a forced conversion package for loss of confidence").  However, plaintiff must "show[] a 'nexus' between the error or injustice and the subsequent" adverse military decision, meaning that the procedural error must have "substantially affected the decision in question."  Cf. Lindsay, 295 F.3d at 1259.  Plaintiff does not explain how the decision to revoke his SEAL NEC was "substantially affected," cf. id., by Cdr. Thorleifson's failure to provide background and a more thorough explanation of his justification on the NEC change request form.  Indeed, had Cdr. Thorleifson provided background and additional justification, this additional detail could only have shown plaintiff in a less favorable light.

Additionally, although Cdr. Thorleifson failed to comply with the requirement to include background and justification with the NEC change request form, this error was remedied during plaintiff's Article 138 proceedings.  Cdr. Thorleifson explained "[a]ll of his reasons to involuntarily remove [Mr.] Volk's trident" in his written response to Mr. Volk's Article 138 complaint, AR 19 (Thorleifson statement), explaining his justification "in detail" and providing supporting documentation, AR 7 (Bonelli letter).  Cdr. Bonelli "specifically note[d]" that Cdr. Thorleifson had not submitted background and justification with the NEC change request form, but found that Cdr. Thorleifson was not wrong to request revocation of Mr. Volk's SEAL NEC based on the justification that was "amply laid out in the administrative record" of the Article 138 proceedings.  Id. at 7-8.  The court therefore concludes that plaintiff has not "show[n] a 'nexus' between the error or injustice and the subsequent" decision to revoke his SEAL NEC.  Cf. Lindsay, 295 F.3d at 1259.

The court understands plaintiff's fourth argument to be based on alleged due process violations.  To the extent that Mr. Volk claims that revocation of his SEAL NEC was contrary to law and should have been overturned by the BCNR on due process grounds, the court may consider whether the BCNR violated Mr. Volk's constitutional rights.  Cf. Holley, 124 F.3d at 1466 (stating that, in determining the merits of a plaintiff's Military Pay Act claim, the court may consider whether the plaintiff's constitutional rights were violated).  Mr. Volk alleges that the Navy improperly failed to notify him that Cdr. Thorleifson had initiated the involuntary revocation of Mr. Volk's SEAL NEC and failed to afford him the opportunity to be heard before a "Trident

Review Board" before the revocation became effective.  See Compl. ¶ 31.  Mr. Volk alleges that he was denied "notice or opportunity to be heard," which he contends was a violation of his rights under the Due Process Clause.  Id. ¶¶ 54-55; cf. id. ¶ 36 (stating that Mr. Volk "was entitled to a Trident Review Board as a matter of fundamental fairness").

Defendant contends that notice and opportunity to be heard before a trident review board are not required under MILPERSMAN 1220-300 and that due process is afforded by, "among other things, [Mr. Volk's] hearing before the BCNR and this limited appeal." Def.'s Mot. 15.  In his briefing, plaintiff does not contend otherwise except to state that the court "may properly consider the underlying due process orientated nature of alleged wrongful governmental conduct."  Pl.'s Mot. 14.  The court observes that its review is limited to the decision of the BCNR.  See supra note 15.  Plaintiff does not explain why the lack of notice or the lack of opportunity to be heard by a trident review board would be contrary to the Navy's regulations or Mr. Volk's right to due process such that the BCNR was required to correct the Navy's error.  Furthermore, plaintiff has been provided an opportunity to be heard in his Article 138 proceedings, before the BCNR and in this action.  See generally AR 6 (Bonelli letter) (considering the arguments in Mr. Volk's Article 138 complaint); AR 4 (BCNR appl.); AR 32 (BCNR appl. statement); Compl.; cf. Heisig, 719 F.2d at 1157 (finding that the plaintiff's application cannot be said to have "received less than adequate consideration" because it was "considered and reconsidered at every level," there was "no indication that the board ignored the governing regulations" and substantial evidence supported its finding (internal quotation marks omitted)); Bullock v. United States, 227 Ct. Cl. 513, 516-17 (1981) (finding that the plaintiff had no due process right to a hearing before an automatic change in his NEC triggered by his conviction for possession of marijuana).[19]  The court therefore concludes that the BCNR did not fail to correct a violation of the Navy's regulations or Mr. Volk's due process rights.

Finally, the court understands plaintiff's fifth argument to be that the BCNR decision arbitrarily failed to address or apply MILPERSMAN 1220-300, relying instead on the Bonelli letter and the BCNR advisory opinion.  See Pl.'s Mot. 8; see also id. at 21

---

[19] Bullock v. United States, 227 Ct. Cl. 513 (1981), an order deciding cross motions for summary judgment, appears in the Federal Reporter in a table of "Decisions by Order Without Published Opinions," see 652 F.2d 69 (1981), and is erroneously described as an unpublished opinion on www.westlaw.com, see No. 46-79 C, 1981 WL 139580 (Ct. Cl. Mar. 3, 1981). However, the order is published in Court of Claims Reports at 227 Ct. Cl. 513.  Court of Claims Reports was the official reporter of the United States Court of Claims, see Commodities Recovery Corp. v. United States, 34 Fed. Cl. 282, 292 n.9 (1995), and the order in Bullock is therefore a published decision, cf. id.; Daniels v. United States, 77 Fed. Cl. 251, 255 n.4 (2007), aff'd per curiam, 269 F. App'x 976 (Fed. Cir. 2008) (unpublished).  The order is correctly reported on www.lexis.com.  See Bullock, No. 46-79, 1981 U.S. Ct. Cl. LEXIS 125 (Ct. Cl. Mar. 3, 1981).

(same); Pl.'s Reply 1 (stating that "the . . . BCNR opinion does not even cite the regulation," rendering the BCNR's review "arbitrary"). Defendant, quoting the BCNR decision, responds that the BCNR reviewed "Mr. Volk's 'application together with all material submitted in support thereof,'" Def.'s Mot. 13 (quoting AR 1 (BCNR decision)), and "the 'applicable statutes, regulations, and policies,'" Def.'s Reply 6 (quoting AR 1 (BCNR decision)). Defendant notes that both the Bonelli letter and the BCNR advisory opinion discussed MILPERSMAN 1220-300 and applied it to Mr. Volk's record. Id.

The applicable regulation provides that, when the BCNR denies an application for the correction of military records without a hearing, it must provide "a brief statement of the grounds for denial." 32 C.F.R. § 723.3(e)(3) (2012). This statement must

> include the reasons for the determination that relief should not be granted, including the applicant's claims of constitutional, statutory and/or regulatory violations that were rejected, together with all the essential facts upon which the denial is based, including, if applicable, factors required by regulation to be considered for determination of the character of and reason for discharge. . . . Attached to the statement shall be any advisory opinion considered by the Board which is not fully set out in the statement.

Id. § 723.3(e)(4).

Plaintiff cites Citizens to Preserve Overton Park, Inc. v. Volpe (Overton Park), 401 U.S. 402 (1971), superseded by statute on other grounds, Pub. L. No. 94-574, 90 Stat. 2721 (1976) (codified as amended in relevant part at 28 U.S.C. § 1331(a)), as recognized in Califano v. Sanders, 430 U.S. 99 (1977), for the proposition that, because the BCNR decision does not mention the relevant regulation, MILPERSMAN 1220-300, it is necessarily arbitrary. Pl.'s Reply 1. In Overton Park, however, the United States Supreme Court found that, for the type of decision challenged by the plaintiff, "formal findings were not required." Overton Park, 401 U.S. at 409, 417. Nevertheless, the Court remanded for a "plenary review" of the contested decision "based on the full administrative record" because the Court found that the lower courts' reviews based on "litigation affidavits" lacked an adequate basis. Id. at 419-20. Overton Park therefore is not analogous to this case and does not support plaintiff's position.

Plaintiff's citation to cases in which courts found that the Army or the Navy failed to make mandatory factual determinations, see Pl.'s Mot. 20-21 (citing Kindred v. United States, 41 Fed. Cl. 106 (1998), appeal dismissed per stipulation, 185 F.3d 878 (Fed. Cir. 1998) (unpublished table decision), and Martin v. Sec'y of the Army, 455 F. Supp. 634 (D.D.C. 1977)), is also inapt. In Kindred, the plaintiff asserted that his discharge for misconduct was unlawful, in part, because two Navy boards and the Secretary of the Navy, in deciding to discharge him, had failed to consider certain "retention factors" in violation of the Navy's regulations. See Kindred, 41 Fed. Cl. at 115. Instead, the factors were first considered by the BCNR after the plaintiff's discharge. See id. at 112; see also

id. at 119 (stating that the BCNR is a civilian body and not part of the discharge process). If favorable findings had been made on all five retention factors, the plaintiff would have been retained.  Id. at 116.  The court found the discharge unlawful, noting that, because the investigating Navy board had not made findings of fact with respect to the retention factors, the Navy board of review--and, accordingly, the BCNR--could not consider the retention factors in the first instance because doing so would be beyond their scope of review.  See id. at 116-17.  The court found that under the scheme created by the Navy regulations, the investigating board was required to make the relevant factual findings, the Navy board of review was required to review and approve the factual findings and the Secretary of the Navy was required to consider the approved findings--none of which had happened.  See id. at 117.

In Martin, the plaintiff sought recharacterization of his discharge from the Army as honorable.  Martin, 455 F. Supp. at 636.  The Army Discharge Review Board (the Review Board) denied his request without making findings of fact.  Id.  The United States District Court for the District of Columbia remanded, stating that the Army was required to "enter findings as to whether the facts warranted . . . [the] plaintiff's separation and . . . general rather than an honorable discharge."  Id. at 640.  The court noted that the Review Board could have upheld the plaintiff's discharge for several reasons, id. at 638, but was "not free to choose among them as to the real basis of the Review Board's affirmance," id. (citing NLRB v. Metro. Life Ins. Co., 380 U.S. 438, 444 (1965)).

In this case, neither the court nor the BCNR must choose among the reasons that revocation of Mr. Volk's SEAL NEC might have been warranted, cf. id., or make factual determinations in the first instance, cf. Kindred, 41 Fed. Cl. at 116-17.  The appropriate military officials, Cdr. Thorleifson and Cdr. Bonelli, have described the factual circumstances supporting the revocation of Mr. Volk's SEAL NEC in detail.  See AR 18-20 (Thorleifson statement); AR 6-8 (Bonelli letter); see also supra Part I.A (summarizing the factual background).  Cdr. Thorleifson and Cdr. Bonelli also applied the standards set out in MILPERSMAN 1220-300 to Mr. Volk, finding that revocation of his SEAL NEC was warranted.  See AR 26 (NEC change request form) ("Recommend revocation of [SEAL NEC] due to sustaining low professional performance in NEC[-]related skills and a major lack of confidence in his capability to operate as a Navy SEAL."); AR 18-20 (Thorleifson statement) (explaining the basis of Cdr. Thorleifson's determination); AR 7-8 (Bonelli letter) (concluding that, pursuant to MILPERSMAN 1220-300, Cdr. Thorleifson was not wrong to revoke Mr. Volk's SEAL NEC on the grounds stated by Cdr. Thorleifson).

A court applying the arbitrary and capricious standard "may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . [but] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc. (Bowman), 419 U.S. 281, 285-86 (1974) (internal citation omitted); accord Nat'l Ass'n of Home Builders v. Defenders of

Wildlife, 551 U.S. 644, 658 (2007).  In the context of judicial review of military personnel decisions, "All that is required is sufficient notification to the serviceman to permit him, if he may, to rebut the board's action."  Craft v. United States, 210 Ct. Cl. 170, 181, 544 F.2d 468, 474 (1976); see also Selman v. United States, 723 F.2d 877, 881 (Fed. Cir. 1983) ("'[Courts] do not demand sterile formality. . . .  [I]f the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference.'" (omission and second alteration in original) (quoting Envtl. Def. Fund v. EPA, 465 F.2d 528, 537 (D.C. Cir. 1972))).  Accordingly, the BCNR was not required to explain its decision "in great detail."  Cf. Dzialo v. United States, 5 Cl. Ct. 554, 563 (1984) (emphasis omitted).

In this case, the BCNR's analytical path, although not set out in detail in its decision, "may reasonably be discerned."  Cf. Bowman, 419 U.S. at 286.  The BCNR did not specifically cite or apply the requirements of MILPERSMAN 1220-300 to the facts of plaintiff's case but stated that it "substantially concurred" with the BCNR advisory opinion and the Bonelli letter.  AR 1 (BCNR decision).  The BCNR advisory opinion and the Bonelli letter both discuss and apply MILPERSMAN 1220-300 in detail.  See generally AR 28-31 (BCNR advisory op.); AR 6-9 (Bonelli letter).  Mr. Volk need only consult these two documents to discern the board's path.  Cf. Bowman, 419 U.S. at 286.  Further, the regulatory provision requiring the BCNR to issue written decisions contemplates that the board may rely on advisory opinions by setting them out in a decision.  See 32 C.F.R. § 723.3(e)(4) (providing that the BCNR must attach to its decision any advisory opinion it considered "which is not fully set out in the statement").  The court discerns no difference between the BCNR's explaining its view by copying an advisory opinion into its decision and attaching that advisory opinion to its decision.  The BCNR decision therefore provided "sufficient notification to [Mr. Volk] to permit him . . . to rebut the board's action."  Cf. Craft, 210 Ct. Cl. at 181, 544 F.2d at 474.

IV.    Conclusion

For the foregoing reasons, defendant's Motion is GRANTED insofar as defendant requests, pursuant to RCFC 12(b)(1), that the court dismiss plaintiff's claims under the First Amendment, the Due Process Clause of the Fifth Amendment and the Whistleblower Act.  See supra Part III.A.  Defendant's Motion is also GRANTED insofar as defendant seeks judgment on the Administrative Record regarding plaintiff's Military Pay Act claim.  See supra Part III.C.  Defendant's Motion is DENIED insofar as defendant requests that the court dismiss plaintiff's Military Pay Act claim pursuant to RCFC 12(b)(6).  See supra Part III.B.

Plaintiff's Motion is DENIED.  See supra Part III.C.

The Clerk of Court shall ENTER JUDGMENT in favor of defendant.  No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge